Filed 7/21/25  P. v. Escobar CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085996 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF2101151) |
| JOSE MARCIAL PORTILLO ESCOBAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Steven G. Counelis, Judge.  Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Tami Falkenstein Hennick and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

In September 2023, a jury convicted Jose Marcial Portillo Escobar of multiple offenses, including, as relevant to this appeal, misdemeanor violation of a domestic violence pretrial protective order (Protective Order or

Order) stemming from an incident on April 2, 2022, involving victim Jane Doe.  (Pen. Code,[1] § 166, subd. (c)(1)(A); count 5.)  On appeal, Escobar contends that his due process rights allegedly were violated because there is no substantial evidence that, when he was served with the Protective Order at his arraignment in July 2021 on separate domestic violence charges also involving Doe, the certified Spanish language interpreter and/or his defense counsel translated the *entire* Order into Spanish, his native language.  For reasons we explain, we disagree with his contention and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On July 20, 2021, during his arraignment on charges including for inflicting a corporal injury on a cohabitant (§ 273.5, subd. (a); count 4), the trial court issued a three-year protective order in favor of Doe.  Escobar, assisted by defense counsel and a certified Spanish language interpreter, was personally served with the Order.  The court addressed Escobar directly and said, "I've signed the protective order.  Sir, do not come within 100 yards of the named individual under [s]ection [1]4 of this order.  Do not contact that person by any means.  You'll be served a copy of this protective order here in court.  No further service is necessary."

The Protective Order included four checked boxes.  Three of them provided Escobar was to have no personal, electronic, telephonic, or written contact with Doe; no contact with Doe through a third party, except through an attorney of record; and not to come within 100 yards of her.

Escobar followed the terms of the Protective Order for about six months.  At the time, Doe was living in Arizona.  In December 2021, she returned to California and moved in with Escobar for about a month, after

---

[1] All further statutory references are to the Penal Code.

they had renewed contact over social media.[2]  She then returned to Arizona for a few months.  While back in Arizona, they remained in contact.

Doe returned to California when she unexpectedly lost her housing.  Initially, she planned on living with her mother.  However, on the drive to California she got into a car accident and ended up at Escobar's home, where she stayed.  Doe testified that she and Escobar discussed the Protective Order "multiple times" while it was in force; and that he expressed concern his sister would find out he and Doe had rekindled their relationship and would turn him in for violating the Order.

On April 2, 2022, Escobar and Doe were living together and in an intimate dating relationship.  Doe testified they argued that day over her daughter, which led to a physical altercation and Doe sustaining injuries to her face and body.  Initially, she did not contact the police out of concern she would be in trouble for living with Escobar while the Protective Order was in place.  After the incident, Doe went to a nearby fire station and asked, allegedly on behalf of a "friend," whether a person protected by a restraining order would be in trouble and have his or her child taken away if he or she resumed a relationship with a restrained person.  Fire personnel reassured her that would not happen and called the police on her behalf, after Doe admitted she was describing her own situation.

The police arrested Escobar, and the People charged him with multiple counts in connection with the April 2 domestic violence incident, including count 5 of violating the Protective Order.  Although the jury convicted him of multiple counts, he appeals only from his conviction on count 5.

---

[2]    The parties agree that count 5 was based on the April 2, 2022 incident, and not on Escobar's myriad contacts with Doe prior to that incident.

DISCUSSION

Escobar concedes that Doe's consent to renew contact is not a defense to his violation of the Protective Order. (See *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1503–1504 [noting a domestic violence restraining order is a type of injunction, and that under Code Civ. Proc., § 533, " '*the court* may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts,' " the law, " 'or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order' " (italics added)].)

Instead, Escobar contends his due process rights were violated because there is no substantial evidence that, as a native Spanish speaker, the entire Protective Order had been translated from English to Spanish when it was served on him. Escobar makes this claim of error despite conceding that, even if the Protective Order had been translated in its entirety, it would not have advised him that it was a violation for him to have contact with Doe even if she consented to, or initiated, the contact.

A. *Due Process of Law and Substantial Evidence*

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense." (*Carella v. California* (1989) 491 U.S. 263, 265.) Among other requirements, to survive a due process challenge the verdict must be supported by substantial evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Under this standard, we review the "whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—

4

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cuevas* (1995) 12 Cal.4th 252, 261 (*Cuevas*).) " 'Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom . . . .' " (*People v. Myles* (2023) 89 Cal.App.5th 711, 739 (*Myles*).) If a finding is supported by substantial evidence, we must affirm that finding, "even if there is also substantial evidence to support a contrary conclusion and the jury might have reached a different result if it had believed other evidence." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1165–1166.)

B. *Sections 162, 166, and CALCRIM No. 2701*

The trial court issued the Protective Order under section 136.2. As relevant here, it provides that, when a defendant has been charged with a crime involving domestic violence, the court on its own motion may issue a pretrial protective order prohibiting a person from having any "communication whatsoever with a specified witness or a victim except through an attorney under reasonable restrictions that the court may impose." (§ 136.2, subd. (a)(1)(D); see *id.*, subd. (e).) Section 166, subdivision (c)(1)(A)[3] makes a violation of section 136.2 a misdemeanor.

The trial court instructed the jury with a modified version of CALCRIM No. 2701 as follows: "The defendant is charged in [c]ount 5 with violating a court order. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. A court issued a written order that the

---

[3] Subdivision (c)(1) of section 166 provides in relevant part: "Notwithstanding paragraph (4) of subdivision (a), a willful and knowing violation of a protective order or stay-away court order described as follows shall constitute contempt of court, a misdemeanor, punishable by imprisonment in a county jail for not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both that imprisonment and fine: [¶] (A) An order issued pursuant to Section 136.2."

defendant have no contact with the protected person; [¶] 2. The court order was a protective order, issued under . . . section 136.2 in a pending criminal proceeding involving domestic violence; [¶] 3. The defendant knew of the order; [¶] 4. The defendant had the ability to follow the court order; [¶] AND [¶] 5. The defendant willfully violated the court order.

"Someone commits an act *willfully* when he or she does it willingly or on purpose.

"The People must prove that the defendant knew of the court order and that he had the opportunity to read the court order or to otherwise become familiar with what it said.  But the People do not have to prove that the defendant actually read the court order."

C.  *Analysis*

Here, the record shows the Protective Order was served on Escobar during his arraignment on charges of domestic violence against Doe.  At the July 20, 2021 hearing, a certified Spanish language interpreter translated for Escobar.  He also was represented by counsel.  As we have summarized, the trial court gave Escobar explicit instructions not to come within 100 yards of Doe and not to contact her "by any means."  In addition, the phrase "NO CONTACT" was handwritten on the Protective Order, supporting the inference that Escobar was separately advised not to have any contact with Doe while the Order was in effect.  (*Myles, supra*, 89 Cal.App.5th at p. 739.)

This evidence confirms the trial court apprised Escobar that any contact with Doe would result in a violation of the Protective Order.  It also shows Escobar was afforded the "opportunity" to "become familiar with what [the Protective Order] said," as defense counsel was present during the hearing and advising him with the assistance of the interpreter.  (See CALCRIM No. 2701.)

6

In addition, the evidence shows that, after being made aware of the "NO CONTACT" requirement, Escobar "willfully" and "knowingly" violated the Protective Order on April 2, when he engaged in domestic violence against Doe, after the two had been living together and in a romantic relationship. (CALCRIM No. 2701; see §§ 7, subd. (b)(1) [" 'willfully' " means "simply a purpose or willingness to commit the act"], 166, subd. (c)(1)(A).) Doe also testified that she and Escobar talked about the Protective Order "multiple times" prior to April 2; and that he expressed concern that his sister would find out he and Doe had rekindled their relationship and report him for violating the Protective Order. This is further evidence in support of the jury's findings he "willfully" and "knowingly" violated the Order.

Although Escobar acknowledges that Doe's consent to resume contact during the term of the Protective Order was not a defense to count 5, he nonetheless contends it was "far from intuitive" that, as a protected person, her willingness to rekindle their relationship would result in *his* prosecution for violation of the Order; and that "[n]othing on July 20 told him otherwise in a language he understood." But as he also acknowledges, the Protective Order itself did not include an advisement that a protected person's consent to contact would still result in a violation of the restraining order by a restrained person. Therefore, whether or not the entirety of the Order was translated into Spanish had no bearing on any purported violation of Escobar's due process rights, as he claims on appeal.

In sum, we conclude the evidence, and the inferences to be drawn from it, amply support the jury's conviction of Escobar on count 5. (See *Cuevas, supra,* 12 Cal.4th at p. 261; *Myles, supra,* 89 Cal.App.5th at p. 739.)

## DISPOSITION

The judgment is affirmed.


                                                               McCONNELL, P. J.

WE CONCUR:


DATO, J.


DO, J.